UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Anna Silva, Administrator of
the Estate of Fernando Ornelas,
    Plaintiff

    v.                             Case No. 14-cv-394-SM
                                       Opinion No. 2020 DNH 123

Elliot Hospital, et al.,
    Defendants

**O R D E R**

Plaintiff, Anna Silva, as administrator of the estate of Fernando Ornelas, filed this action against defendants, Elliot Hospital, Hillsborough County, the Hillsborough County Department of Corrections, as well as several employees of those entities, asserting claims arising out of injuries Ornelas sustained while in their custody.  The Hillsborough County defendants have moved for partial summary judgment on plaintiff's 42 U.S.C. § 1983 claims against them.[1]  Plaintiff

---

[1]    Elliot Hospital filed a motion for partial summary judgment on plaintiff's N.H. Rev. Stat. Ann. Ch. 135-C claim.  However, that claim is not asserted against the Elliot in plaintiff's most recent amended complaint, filed on March 23, 2020.  See Pl.'s Second Amended Compl. (Document No. 156).  Therefore, that motion is moot.

Elliot Hospital moved for judgment on the pleadings as to plaintiff's claims for enhanced compensatory and punitive damages.  Plaintiff's Omnibus Objection states that she "does not oppose the Defendant Elliot Hospital's Motion for Judgment on the Pleadings as to Claims for Enhanced Compensatory and

opposes that motion.  Defendants' motion is granted in part and denied in part.

## STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).  Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof

_____

Punitive Damages."  Pl.'s Mem. in Opp. (Document No. 144) at n. 1.

Accordingly, Elliot Hospital's Motion for Judgment on the Pleadings on plaintiff's enhanced compensatory and punitive damages claim is granted.

at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52 (1st Cir. 2014). See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## BACKGROUND

The following facts are set forth "in the light most favorable to the nonmoving party to the extent that they are supported by competent evidence." Leite v. Bergeron, 911 F.3d 47, 49 (1st Cir. 2018) (citing Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 3 (1st Cir. 2018)) (further quotation omitted). The court's summary includes only those facts relevant to the pending motion.

On October 15, 2013, Fernando Ornelas, age 54, was in a car accident. Ornelas was disoriented and was promptly taken to the Elliot Hospital by his sister. He arrived at the Elliot at around 7 p.m.

At the Elliot, Ornelas's sister asked for a mental health examination, as Ornelas had previously suffered from mental health issues.  Elliot medical personnel diagnosed Ornelas with bipolar disorder, and, with his sister's consent, issued an Involuntary Emergency Admissions ("IEA") order, committing him on an emergency basis for further evaluation and treatment. N.H. Rev. Stat. Ann. Ch. 135-C:27.  The IEA noted that Ornelas was displaying signs of paranoia, hallucinations, and mood swings, and that he posed a likelihood of danger to himself and others.

There were no beds available at New Hampshire State Hospital, the selected psychiatric hospital.  So, Ornelas was moved to the Elliot's own secure mental health ward, Psychiatric Evaluation Program (PEP), where he remained for several hours awaiting transfer to the New Hampshire State Hospital.  At approximately 6 p.m. on October 16, 2013, Ornelas was involved in a physical altercation with Lawrence Bolduc, a security officer at the Elliot.  Ornelas sustained several injuries.  As a result of the altercation, Ornelas was arrested by the Manchester Police Department, and charged with simple assault.

Prior to removing Ornelas from the hospital, the Manchester Police Department asked Elliot medical personnel to determine whether he was medically stable enough to be taken into custody. Ornelas underwent a physical exam and diagnostic studies, including a CT scan of his head.  No x-rays or CT scans of the back of Ornelas's head or neck were taken.  Following the examination, Elliot medical personnel determined that Ornelas was sufficiently stable to be discharged into the custody of the Manchester Police Department.

At 10:45 p.m. on that same evening, Ornelas was discharged from the Elliot, and placed in the custody of the Manchester Police Department.  Ornelas was given medical discharge instructions from the Elliot, which stated:

> Apply ice to facial injuries.  Take Tylenol 650 mg every 6 hours for pain.  Patient is IEA'd to state hospital, awaiting placement there.  <u>Return to emergency department as soon as possible if persistent vomiting, confusion, weakness to arms or legs or any other concerns</u>.

Def.'s Mot. for Summary Judgment, Martin Decl., Exh. 1C at p. 2 (emphasis added).  Those instructions also directed Ornelas to seek emergency care in the event of "increasing confusion or a change in personality . . . You do not know where you are . . . You have new problems with vision, your speech becomes slowed or

5

confused . . . You have arm or leg weakness, loss of feeling, or new problems with coordination."  Id., at p. 5.

Ornelas arrived at the police station at 11:15 p.m. and was booked on a charge of simple assault.  After booking, he was transferred to the custody of defendant Hillsborough County Department of Corrections ("HCDOC"), and transported to the Valley Street Jail, where he arrived at approximately 12:05 a.m. on October 17, 2013.  At that point, Ornelas had been awake for over 24 hours.

As part of the jail's booking process, Ornelas was evaluated by defendant Flavia Martin, a registered nurse for HCDOC.  Martin was informed that Ornelas had been in an altercation with an Elliot security officer, and had been cleared by the Elliot for discharge before being taken into custody by the MPD.  Martin reviewed Ornelas's discharge instructions from the Elliot.

Martin took Ornelas's blood pressure, which was 150/100. She recorded that both of Ornelas's pupils were pinpoint, his eyes were bloodshot, and he had a contusion to his lower lip, as well as a laceration under his right eye.  Martin further noted that Ornelas's gait was slightly unsteady.  While Martin did not

record that Ornelas was complaining of neck pain, defendant HCDOC Lieutenant Angela Boyer, who was present during the medical assessment, stated that Ornelas complained of neck pain during the examination.  See Pl.'s Exh. 1A, Boyer Deposition at 60:23-61:3.  Ornelas also told Martin that he was suffering from blurry vision bilaterally.  Finally, Ornelas was acting oddly: when asked to pull his up pants, he began to pull them down instead.

Martin was aware that Ornelas was subject to an IEA order committing him to the state hospital, so she filled out HCDOC's Mental Health Screening form.  Ornelas told Martin that he was bipolar, had a history of psychosis and paranoia, and that he was feeling paranoid.  Martin did not complete the entire Mental Health Screening form, but she did note that Ornelas was at risk for suicide.  Because of Ornelas's IEA and his mental health history, Martin contacted Dr. Paul Harris, an on-call psychologist for the HCDOC.  Dr. Harris recommended that Ornelas be placed on "special watch," and secured in a safety smock.

At 2:30 a.m., Martin reevaluated Ornelas in his cell.  At that time, she noted his blood pressure was 154/96, and that he complained of a headache, blurry vision in both eyes, dizziness, and pain in his neck.  Martin again noted that Ornelas had

pinpoint pupils.  She performed a neurological test, recording that Ornelas had weak grip strength in both hands.  When asked to squeeze Martin's hands harder, Ornelas responded he could not, because it hurt his neck.  Martin attributed Ornelas's neck soreness to his recent altercation at the Elliot.  She asked Ornelas if he could move his head and neck; Ornelas shook his head "no," but, in shaking his head, demonstrated what Martin considered to be good movement.  Ornelas was also able to correctly identify the number of fingers Martin held up.  Martin provided Ornelas with ice for his eye injury and asked him to sign an authorization for treatment (so that she could provide him with the Tylenol the Elliot had prescribed).  Ornelas became agitated and refused to sign the authorization.  Martin left his cell without providing the Tylenol.

At about 5:45 a.m., defendant HCDOC Officer Quinnford Robinson observed Ornelas in his cell.  Ornelas was placing his pillow into the toilet to flood his cell, and he was spreading the overflowing water over the cell floor.  Ornelas had removed his safety smock, so he was naked, and he was using the smock to spread the water.  Robinson reported Ornelas's behavior to defendant HCDOC Sergeant Joshua Jordan.  Jordan asked Ornelas to stop, but Ornelas responded that he would not, because "it's my

. . . umbrella, and I'm ready to go now."  Def.'s Mot. for
Summary Judgment, Exh. 2, Jordan Decl. at ¶ 5.

Jordan attempted to reason with Ornelas, but when he could
not, Jordan ordered him to come to the front of the cell, kneel
down, and place his hands behind his back.  Ornelas refused, and
instead, urinated on his cell door, so that the urine flowed
under the door, towards where the COs were standing.  Ornelas
became increasingly agitated, spitting and throwing wet toilet
paper at the cell window.  He then began charging his cell door,
running from the back of the cell and repeatedly striking the
metal cell door with his head.

Unable to persuade Ornelas to stop, Officer Jordan sprayed
Ornelas with pepper spray (Oleoresin Capsicum, or "OC"), on
three occasions.  The OC spray seemed to have little or no
effect on Ornelas's behavior, as he continued to pace and yell,
charge his cell door, and jam his safety smock and blanket into
the door track.  Having observed Ornelas deliberately hitting
his head on the cell's metal door several times, Jordan
consulted his supervisor, Lieutenant Boyer, who made the
decision to remove Ornelas from the cell, and place him in the

jail's restraint chair.[2]  Boyer also notified Martin, and asked her to report to Ornelas's cell, so that medical staff would be present during the removal process.

Because Ornelas had jammed the door track with his smock and blanket, the cell door would not open at first.  Once the officers were able to open the door, defendants HCDOC officers Max Munyanya, Todd Gardner, and Robinson entered Ornelas's cell. Ornelas, still naked, moved to his top bunk when the three officers entered the cell.  He jumped off the bunk towards the officers.  Officer Gardner caught him, and Ornelas was slammed to the cell floor, with Gardner's hands under Ornelas's back. Ornelas continued to struggle, as Munyanya and Gardner turned him over, placing his arms behind his back.[3]  Eventually, Ornelas was put in leg and hand restraints.  At this point, his nose was bleeding heavily, some of his wounds had reopened, and the floor of his cell was bloodied.

---

[2]    Officer Slack was instructed to videotape the removal. However, the video camera allegedly malfunctioned, and no recording is available.

[3]    Multiple HCDOC employees testified to "rumors" that Officer Robinson kicked Ornelas in the head at some point, and plaintiff alleges that, at some point during the removal, Ornelas's head was slammed against the cell's toilet.  However, the record includes no competent evidence that either of those events actually occurred.

Ornelas was taken to the shower area to remove the OC chemicals, as well as clean up the blood from his wounds.[4]  His condition at that point is disputed.  Defendants contend that Ornelas was still actively resisting, but the plaintiff contends he was semi-conscious, and unable to walk on his own.  From the shower, Ornelas was taken to the cell that contained the prisoner restraint chair.  While Jordan supervised, Gardner, Robinson and Munyanya placed Ornelas into the chair, securing his head by placing their hands on his ears, and forcibly turning his head.  Officer Munyanya placed a mesh transport hood on Ornelas to prevent him from spitting on staff.  During this time, Ornelas was behaving in a bizarre manner, singing, and asking the COs if they would like to dance.

After Ornelas was secured in the restraint chair, at approximately 5:45 a.m., he was again evaluated by Martin. Martin noted that the laceration below Ornelas's right eye had reopened, and he had blood on his face.  She further noted that Ornelas was uncooperative, so she was unable to assess his mouth, but he could move all his extremities and his head.

---

[4]     Ornelas testified at deposition that, while he had no memory of the majority of the events recounted here, he remembered being kneed in the back of the head and kicked in the side of his face in the hallway outside his jail cell.

Martin reported that Ornelas was highly agitated, and difficult to evaluate.

Martin examined Ornelas again at approximately 6:45 a.m. He was still in the restraint chair.  At that time, she noted that Ornelas was quiet, cooperative, and answering her questions. Ornelas stated that he was "okay."  He was still wearing the transport hood, but Martin recorded that she was able to observe dried blood below his eye.  She further recorded that he had circulation, sensation, and movement in all extremities.  Martin did not assess his pupils.

Martin's shift ended shortly after that 6:45 a.m. examination.  She was replaced by defendant HCDOC nurse Zina Barnes.[5]  Martin advised Barnes that Ornelas was subject to an IEA order, had been diagnosed with a head injury, had been cleared for discharge by the Elliot, and had a history of mental disorders.  Martin advised that Ornelas had reported blurry vision bilaterally, had contusions to his lips, and a laceration under his right eye.  She further advised that his gait was

---

[5]    Barnes was accompanied by HCDOC new employee and nurse, Corrine Foley, who she was training.

slightly unsteady, and he had complained of neck pain (but she did not report Ornelas's bilateral grip strength issues).

HCDOC policy requires that a prisoner in the restraint chair be observed every 15-minutes by a CO, with visits from a supervising sergeant every hour.  HCDOC policy further requires hourly medical checks.  Sergeant Todd Gordon, who arrived for his shift at HCDOC at 6:30 a.m., first checked on Ornelas at approximately 7 a.m.  Because of his concerns about Ornelas's condition, Gordon decided to increase both his checks, and Ornelas's medical checks, from hourly to every 15-minutes.

At approximately 7:45, Lieutenant Robbins conducted his third check on Ornelas, and he observed that Ornelas was muttering, his words were unintelligible, and he appeared to be coming in and out of sleep.  Nurse Barnes evaluated Ornelas at 7:45 a.m. as well.  She recorded that he was intermittently responsive to verbal questions, his head would droop, and, at times, it took him a few moments to respond to questions.  Barnes was concerned, but she attributed Ornelas's delayed responses to the fact that he had not slept for several hours.

At approximately 8 a.m., Barnes reevaluated Ornelas.  He was able to state his name, and the correct year, but he had no

awareness of his surroundings, and believed he was in the hospital.  His head drooped, and his eyes closed for several seconds during questioning.  Ornelas's blood pressure was 102/68, and his pulse was 64.  Barnes noted that Ornelas's left eye was slightly reactive to light, and his right eye was non-reactive.  She observed that Ornelas's right eye was bruised and swollen.

At approximately 8:30 a.m., Ornelas was again evaluated by Nurse Barnes, and, a few minutes later, by defendant William Fuller, the HCDOC health services supervisor, who had just arrived at HCDOC to begin his day.  After observing Ornelas, Fuller left to read the discharge instructions from the Elliot. Barnes noted that Ornelas was still intermittently responsive to verbal commands, his head continued to droop, and his eyes would close at times.  Ornelas's blood pressure was 102/60, noted to be faint, and his pulse was 82.

Fuller returned to check on Ornelas approximately 20 minutes later with Barnes, upon the request of the corrections department, because they had decided to remove Ornelas from the restraint chair.  At that time, Ornelas was unresponsive, despite several attempts, and "cool to touch."  His pupils were pinpoint and nonreactive, and he was drooling blood.  His blood

14

pressure was 95/56, and both pupils were unresponsive to light. Fuller requested an ambulance, which arrived at approximately 9:10 a.m., and Ornelas was transported back to the Elliot Hospital.

Upon arrival at the Elliot, Ornelas was examined by emergency department physicians.  He was unresponsive, unable to answer questions, unable to hand grasp, had obvious trauma to the right side of his head, right forehead periorbital, face swelling, and cervical spondylosis.  The emergency room personnel did observe and record movement of his extremities. Ornelas was sedated and intubated.  Upon further examination, Ornelas was found to be suffering from quadriplegia, unstable C4-C5, and other cervical spinal cord injuries.  Because of the severity of his injuries, Ornelas was transported to Massachusetts General Hospital, where he underwent emergency surgery to stabilize his cervical fracture.

Upon discharge from Massachusetts General, Ornelas was transferred to the Crotched Mountain Rehabilitation Facility in New Hampshire, where he remained, permanently paralyzed, until he was transferred to the Riverside Rest Home, in August of 2017.

Ornelas had filed a grievance and complaint, requesting
that the New Hampshire Attorney General's office conduct an
investigation into his treatment while in custody.  After
completing that investigation, the Attorney General's office
concluded that there was insufficient evidence to bring any
criminal charges.  In September of 2014, Ornelas filed this
civil action.  The complaint, which has been amended several
times, asserts, inter alia, Section 1983 claims against the
Hillsborough County defendants based upon deliberate
indifference to his medical needs, as well as the use of
excessive force.

While being cared for at Riverside, Ornelas developed a
serious pressure ulcer, a common risk for paralyzed individuals.
That ulcer required surgery, which led to other complications,
and, eventually, Ornelas's death, on August 29, 2019.

## DISCUSSION

### Section 1983 – Constitutionally Inadequate Medical Care

Plaintiff asserts Section 1983 claims, seeking damages for
"denial of constitutionally adequate medical care" against
Hillsborough County, and the HCDOC, HCDOC Superintendent David
Dionne, in his individual and official capacities, and Fuller,
in his official and individual capacities, as well as against

16

Robinson, Munyanya, Gardner, Gordon, Jordan, Slack, Boyer, Robbins, Martin, Barnes, HCDOC Corrections Officer Eldin Medic, and HCDOC Corrections Officer George Antillus.

"The Eighth Amendment, applied to the states through the Fourteenth Amendment, protects incarcerated people from state corrections officials' 'deliberate indifference to serious medical needs.'" Zingg v. Groblewski, 907 F.3d 630, 634 (1st Cir. 2018) (quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161-62 (1st Cir. 2006)) (further quotations omitted). An Eighth Amendment "deliberate indifference" claim has two components, one objective and one subjective. Id. at 634. "[T]o prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (citation omitted).

Defendants make three arguments in support of their motion for judgment on plaintiff's claim against them for deliberate indifference to Ornelas's serious medical needs. First, they say, plaintiff's claims fail as a matter of law because plaintiff has not sufficiently established either a serious

17

medical need, or that defendants acted with deliberate indifference with respect to a serious medical need.  Second, with respect to plaintiff's Monell claim against the County, defendants contend that, even if it could be established that defendants acted with deliberate difference, plaintiff cannot establish the causation required to support a Monell claim. Finally, defendants argue that, in any event, the individual Hillsborough County defendants are entitled to qualified immunity from liability.

1.   "Serious Medical Need"

"[A] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).  "A significant risk of future harm that prison administrators fail to mitigate may suffice under the objective prong."  Kosilek v. Spencer, 774 F.3d 63, 85–86 (1st Cir. 2014) (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)) (further citations omitted).

Defendants seek to define Ornelas's serious medical need narrowly, limiting it to the cervical fracture he sustained,

which, defendants say, was the actual cause of his medical
condition.  Defendants argue that Ornelas's cervical fracture
cannot be considered a medical need "diagnosed by a physician as
mandating treating," because the fracture was not diagnosed
until Ornelas returned to the Elliot from the jail, on October
17.  While Ornelas was at the Valley Street Jail, defendants
say, he did not show symptoms of an obvious cervical injury.
They point out that Ornelas had just been discharged from the
hospital, following a medical examination that failed to
identify a cervical injury, and Ornelas's ongoing symptoms were
not obviously related to a cervical fracture.  Thus, defendants,
say, plaintiff has not shown that Ornelas suffered a "serious
medical need."

     Plaintiff responds that Ornelas's serious medical needs
were hardly limited to the cervical fracture.  Ornelas's medical
needs were multiple, including his obvious mental health
debilitations and assorted self-destructive behaviors, as well
as his head trauma and neurological symptoms.  Plaintiff points
out that, prior to leaving the Elliot, Ornelas was diagnosed
with, inter alia, "Bipolar 1 disorder, most recent episode (or
current) for manic, severe, specified as psychotic behavior,"
agitation, paranoia, psychosis, contusions of the face, scalp
and neck, and head trauma."  Ornelas's symptoms, including

observable signs of a traumatic brain injury, were so obvious
that even a layperson would recognize them, argues plaintiff.[6]

The record suggests that Ornelas's medical needs were fully
and understandably described by the Elliot Hospital in the
discharge instructions it provided to the HCDOC's medical staff.
Medical diagnoses included bipolar disorder, psychosis, and
paranoia (which necessitated an IEA), as well as traumatic head
injury and neck contusions.  Those diagnosed conditions qualify
as "serious medical needs" for purposes of plaintiff's
deliberate indifference claim.

2.  "Deliberate Indifference"

Defendants' position relative to the subjective component
of plaintiff's deliberate indifference claim is more
substantive.  As our court of appeals recently stated:

> A prison official is deliberately indifferent where
> she "knows of and disregards an excessive risk to
> inmate health or safety." [Farmer v. Brennan, 511
> U.S. 825, 827 (1994)].  This requirement is
> subjective.  See Zingg v. Groblewski, 907 F.3d 630,
> 635 (1st Cir. 2018).  Deliberate indifference is
> characterized by "obduracy and wantonness, not

---

[6]   The record contains evidence that Ornelas's head trauma
signs were obvious to several laypeople: several COs testified
that they believed he had a concussion.  See, e.g., Pl.'s Exh.
1A, Antillus Deposition at 53:1-4; see also Pl.'s Exh. 1A,
Martineau Dep. at 71:1-12.

inadvertence or error in good faith." Whitley v.
Albers, 475 U.S. 312, 319, (1986). "To show such a
state of mind, the plaintiff must provide evidence
that the defendant had 'actual knowledge of impending
harm, easily preventable,' and yet failed to take the
steps that would have easily prevented that harm."
Zingg, 907 F.3d at 635 (quoting Watson v. Caton, 984
F.2d 537, 540 (1st Cir. 1993)). "[D]eliberate
indifference entails something more than mere
negligence," but is "satisfied by something less than
acts or omissions for the very purpose of causing harm
or with knowledge that harm will result." Calderón-
Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir.
2002) (quoting Farmer, 511 U.S. at 835). "This
standard, requiring an actual, subjective appreciation
of risk, has been likened to the standard for
determining criminal recklessness." Giroux v.
Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999).

Leite v. Bergeron, 911 F.3d 47, 52–53 (1st Cir. 2018).

### A. HCDOC Medical Staff

Defendants argue that plaintiff's deliberate indifference
claims amount to nothing more than a disagreement about what
medical care should have been provided to Ornelas. And,
defendants say, those disagreements do not rise to the level of
constitutional significance unless the care received was "so
clearly inadequate as to amount to a refusal to provide care."
Def.'s Mem. in Supp. of Mot. for Summary Judgment at 16 (quoting
Toracco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991)).
Defendants point out that Ornelas was examined by HCDOC medical
staff eight times in the nine hours he was present at the Valley
Street Jail – his condition was actively monitored during his

entire stay.  And, defendants say, while Ornelas was at Valley
Street, HCDOC's medical staff exercised their best judgment in
providing him with appropriate medical care, based on the facts
available to them at the time.

At issue here is both the medical care Ornelas received at
HCDOC, and the judgment exercised by HCDOC medical staff with
respect to Ornelas's needs.  The law governing this area is
reasonably well-settled.  Generally, courts are "reluctant to
second guess medical judgments and to constitutionalize claims
which sound in state tort law."  Layne v. Vinzant, 657 F.2d 468,
474 (1st Cir. 1981) (citation omitted).  Not every claim of
"substandard care, malpractice, negligence, inadvertent failure
to provide care, [or] disagreement as to the appropriate course
of treatment" in a prison creates a constitutional cause of
action.  Ruiz-Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir. 2007).
"[M]isjudgment, even negligent misjudgment, is not deliberate
indifference."  Ramos v. Patnaude, 640 F.3d 485, 490 (1st Cir.
2011).  Rather, to act, or fail to act, with deliberate
indifference,  an "official must both be aware of facts from
which the inference could be drawn that a substantial risk of
serious harm exists, and [that official] must also draw the
inference.'"  Leavitt, 645 F.3d at 497; (quoting Farmer v.
Brennan, 511 U.S. 825, 837 (1994)).

First, it cannot be disputed that the HCDOC defendants were aware that Ornelas arrived with a diagnosed traumatic head injury. The Elliot's discharge instructions plainly inform of the head injury and equally plainly state that, if Ornelas experience[s] any of the following symptoms, he should immediately be seen in an emergency room, doctor's office or clinic: increasing confusion or a change in personality; blood or clear fluid coming out of the nose; "[y]ou do not know where you are;" new problems with vision (blurry or double vision); confused speech; and arm or leg weakness or loss of feeling. Defs.' Exh. 1C at p. 2. HCDOC medical staff observed Ornelas exhibiting nearly every one of those symptoms during his time at Valley Street.[7] But, they failed to return Ornelas to the

---

[7] Confusion: When asked to pull up his pants during Nurse Martin's 12:30 examination, Ornelas instead pulled them down (see Pl.'s Exh. 1A, Martin Dep. at 176:13-17; Ornelas told Jordan that his safety smock was an umbrella (See Def.'s Exh. 2, Jordan Decl. at ¶ 5); Ornelas did not know where he was (he thought he was at the hospital, not the Valley Street Jail). See Pl.'s Exh. 1A, Barnes Dep. at 113:17-23.

Weakness: Martin noted Ornelas's grip strength was weak at her 2:30 a.m. examination. See Def.'s Exh. 1, Martin Decl. at ¶ 9.

Numbness: Ornelas complained his left foot was numb during Martin's 6:30 a.m. examination. See Pl.'s Exh. 1A, George Zarzycki Dep. at 74:20-75:11.

hospital (or emergency room, doctor's office, or clinic) for evaluation and treatment, as instructed.  Nor was a physician provided or consulted, with respect to Ornelas's deteriorating condition.  It appears from the record that the HCDOC medical staff ignored the Elliot's discharge instructions, instructions that plainly informed them of the complications that might arise from a traumatic head injury, which conditions required a return to the hospital, or prompt medical attention by a physician in an emergency room, clinic, or doctor's office.

A case with similar facts arose in California.  Ortiz v. City of Imperial, 884 F.2d 1312 (9th Cir. 1989) (per curiam). There, the plaintiff, Ortiz, fell and struck his head while in custody.  Id. at 1313.  Ortiz was taken to the emergency room

---

Nosebleeds: Blood was coming from Ornelas's nose following the extrication from his cell.  See Pl.'s Exh. 1A, Boyer Dep. at 87:20.

Vision problems: Ornelas complained of blurry vision. See Def.'s Exh. 1, Martin Decl. at ¶¶ 7, 9.

Pinpoint pupils: Martin observed pinpoint pupils at 12:30 a.m., and again at her 2:30 a.m. assessment.  See Pl.'s Exh. 1A, Martin Dep. at 112:21-113:13; 140:13-15.  See also Def.'s Exh. 1, Martin Decl. at ¶ 9.  Barnes observed that one of Ornelas's pupils was non-reactive to light at her 8:00 a.m. examination.  See Pl.'s Exh. 1A, Barnes Dep. at 122:15-16.

Confused Speech: At his first check on Ornelas at 7:45 a.m., Robbins observed Ornelas muttering words that were unintelligible.  See Pl's Exh. 1A, Robbins Dep. at 25:19-23.

and diagnosed with a head injury.  Id.  He was discharged from the hospital with a "patient after care sheet" that set forth instructions similar to those prescribed by the Elliot for Ornelas.

The parties agreed that Ortiz received medical care upon his return to jail – "his medical charts show jail medical personnel monitored him closely."  Id.  At issue in the case was, as here, "the significance of the care [Ortiz] received." Id.  More specifically, "when Ortiz began to exhibit the symptoms identified on the sheet, [the medical personnel caring for Ortiz] did not call the emergency room or [the diagnosing doctor.]."  Id.  Instead, they prescribed sedatives, which are not appropriate for head injuries.  "Two days after falling, Ortiz was found unconscious with blood coming from his mouth." Id.  He died ten days later, due to head trauma from his fall. Noting that "access to medical staff is meaningless unless that staff is competent and can render competent care," the Court of Appeals for the Ninth Circuit held:

> Because the [medical personnel] knew of Ortiz's head
> injury but disregarded evidence of complications to
> which they had been specifically alerted and, without
> an examination, prescribed sedatives that were
> contraindicated, we cannot say as a matter of law they
> were not deliberately indifferent to Ortiz's medical
> needs.

Id. at 1314.

The record in this case straddles the line between apparent medical incompetence and negligence on the one hand, and deliberate indifference, on the other.  Ornelas arrived at Valley Street in a mentally unstable condition, with a diagnosed traumatic brain injury, and, importantly, with clear, easily understood medical directions to return him to the hospital should any of the described symptoms be observed.  A reasonable jury may conclude that HCDOC medical staff knew, based on the hospital's discharge instructions, that Ornelas should be returned to the hospital if he exhibited the described symptoms. A jury might find that defendants knew, based on this record, that Ornelas was experiencing virtually all of those symptoms. And, a jury could conclude that the risk of very serious adverse consequences resulting from failure to return Ornelas to the hospital were obvious, even to a layperson, but especially to any trained medical professional.

A jury could well find on this record, construing the evidence in plaintiff's favor, that defendants were aware of facts giving rise to an inference of substantial risk of serious harm to Ornelas, and that they actually drew such an inference. A jury might also find that merely conducting routine periodic

observations of Ornelas, and documenting those observations, without taking even the most rudimentary treatment steps to address his fast-deteriorating conditions – like following the plain and straightforward directions to return him to the hospital if the very conditions being observed and documented occurred – amounted to deliberate indifference to his serious medical needs.

That jail medical staff followed established protocols regarding observation and documentation is not enough to avoid liability.  The purpose of such protocols is not merely to perform the observations and record them.  The purpose is to ensure that critical information is obtained in a timely manner so that necessary action can be taken to avoid serious injury or death.  Here, a jury could reasonably conclude that, while jail officials generally implemented the jail's observational and monitoring protocols, they had no apparent intention to act on the information acquired to address Ornelas's deteriorating condition and his increasingly desperate medical needs.  There is no evidence in this record suggesting any legitimate reason for the failure to return Ornelas to the hospital when he first manifested the described symptoms warranting such action, and medical staff observed and recorded those manifestations. Failure to act under such circumstances could be found by a jury

27

to amount to deliberate indifference; a jury might well conclude that officials did have a subjective appreciation of the substantial risk posed by merely observing and doing nothing in response to the symptoms observed, despite plain directions to act if such symptoms were observed given by the discharging hospital only hours earlier.  Such conduct can be found to amount to a knowing refusal to provide necessary care.  That is, the care actually received could be found by a jury to be "so clearly inadequate as to amount to a refusal to provide essential care."  Toracco, 923 F.2d at 234 (quotation omitted). Construing the facts and all reasonable inferences in Ornelas's favor, it cannot be said that defendants have established their entitlement to judgment as a matter of law.

The record also includes evidence from which a jury could conclude that HCDOC's abject failure to follow the Elliot's medical discharge directions caused or contributed to cause Ornelas's paralysis and related death.  Several of plaintiff's experts opined on the issue.  For example, emergency physician Dr. David Milzman stated:

> Mr. Ornelas's condition was left untreated and even
> exacerbated when he struck his head against his cell
> door in a confused and agitated state, was forcibly
> extracted from his cell, physically restrained, had
> his head and neck forcibly rotated during
> examinations, and left unattended with apparent

> disregard to his worsening physical and mental
> condition. . . .   [The] unsupported nature of the
> restraint used on Mr. Ornelas as well as the position
> he was placed in, without proper monitoring and the
> lack of appropriate intervention absolutely led to his
> worsening injury . . . In addition, allowing his blood
> pressure to drop and keeping him upright[,] he
> suffered some hypoxic brain injury as his cerebral
> perfusion was inadequate to meet the metabolic needs
> of his brain.

Pl.'s Exh. 5 at p. 9.  Dr. Peter Whang, an orthopedic surgeon

with a specialty in spinal surgery, similarly opined: "It is my

opinion that the events at the Valley Street Jail, particularly

but not limited to his striking his head against the cell door,

physical altercation with corrections officers, and the forceful

manipulation of his head back and forth contributed to a

worsening of Mr. Ornelas's cervical fracture with eventual

displacement resulting in a spinal cord injury."  Pl.'s Exh. 6

at p. 9.


     Defendants challenge use of that expert opinion evidence,

for purposes of resolving summary judgment, on grounds that

plaintiff's counsel has not bothered to present it in an

admissible form (i.e., supported by an affidavit).  The point is

well taken – counsel is obligated to do so.  No doubt at trial

the witnesses will testify under oath or by deposition properly

offered.

The expert opinions are not critical here, however, for the issue now is not the specific nature and degree of harm caused by the failure to address Ornelas's serious medical needs, but whether the record justifies entry of summary judgment in defendants' favor, as a matter of law, on that claim.  It does not.  The record, as it stands, and ignoring the challenged reports, discloses genuine disputes of material fact regarding whether jail medical officials were deliberately indifferent to Ornelas's serious medical needs, and the extent of his resulting injuries.  That his medical conditions deteriorated significantly during the time after he first displayed symptoms that arguably mandated a return to the hospital or provision of a competent physician's care, and his eventual return to the hospital, cannot be denied.  That physical deterioration and its attendant physical suffering, is itself sufficient injury, causally derived from the failure to act, to support plaintiff's deliberate indifference claim.

Defendants conclude by arguing that, in the end, medical staff should be entitled to qualified immunity from any liability.  But that possible entitlement is inseparably bound up in factual determinations that must necessarily be made by the jury.  It is clearly established than an officer's deliberate indifference to a prisoner's serious medical needs

resulting in harm gives rise to personal liability under Section
1983.  See Gaudreault v. Municipality of Salem, Mass., 923 F.2d
203, 208 (1st Cir. 1990) ("The Eighth Amendment . . .  imposes a
duty to attend to a prisoner's serious medical needs. Government
officials violate the Constitution if they exhibit deliberate
indifference to such needs.") (internal quotations and citations
omitted).  Whether these defendants were deliberately
indifferent turns on objective and subjective facts – genuinely
disputed material facts – with respect to the inferences arising
from all the circumstances, and whether defendants drew
inferences satisfying the subjective element of the cause of
action.  If those disputed factual issues are resolved against
defendants, they are not entitled to qualified immunity, for
they will have been found to have deliberately denied
plaintiff's decedent minimally adequate medical care for his
serious needs.  If resolved in favor of defendants, there will
be no need for qualified immunity as there will be no liability.

        Defendants' motion for summary judgment on plaintiff's
claims based on alleged deliberate indifference to Ornelas's
serious medical needs is denied as to Martin, Barnes and Fuller,
because genuine disputes as to material facts preclude the entry
of summary judgment as a matter of law.

B.   <u>HCDOC Non-Medical Staff</u>[8]

Whether the HCDOC non-medical staff were deliberately indifferent requires a separate analysis, which counsels a different result.  "Any inquiry into the reasonableness of the prison officials' actions 'incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions.'"  <u>Burrell v. Hampshire Cty</u>., 307 F.3d 1, 8 (1st Cir. 2002) (quoting Farmer, 511 U.S. at 845).

Plaintiff fails to point to evidence in the record tending to show that any HCDOC non-medical staff read, or were obliged to read, the Elliot Hospital's discharge instructions, much less were required to, but failed to, comply with them.  Instead, plaintiff broadly argues that the COs "did nothing" to help Ornelas receive adequate medical care.  But the jail had qualified medical staff assigned to provide medical care, and,

---

[8]    Plaintiff asserts a supervisory liability claim against HCDOC Superintendent Dionne in his individual capacity.  While defendants argue that plaintiff's claims against Dionne in his <u>official</u> capacity should be dismissed, their briefing does not include any meaningful discussion of plaintiff's claim against Dionne in his individual capacity.  To that extent, the motion is denied without prejudice.  While it is doubtful that this record will support an individual or official claim against Superintendent Dionne, absent developed argument by either side, the court declines to consider the merits of plaintiff's supervisory liability claim against Superintendent Dionne at this time.

from the officers' position, medical staff no doubt appeared to be carrying out their responsibilities.

    The record evidence cannot support the claim, in any event. For example, Jordan, Munyanya, Robinson, and Gardner intervened to extricate Ornelas from his cell, and restrain him, to stop him from injuring himself any further.  Before removing Ornelas from his cell, Boyer summoned Martin, so that HCDOC medical staff would be present during the extrication.  And, while Ornelas was restrained, Gordon decided medical checks should be conducted more frequently because of his concerns regarding Ornelas's condition.  Finally, as previously discussed, HCDOC's non-medical staff all reasonably relied on the fact that Ornelas's condition was being frequently evaluated by HCDOC's medical staff during the entirety of his time at Valley Street. See Schultz v. Houle, No. 16-CV-11774-PBS, 2018 WL 1188753, at *6 (D. Mass. Mar. 5, 2018) (correctional officers "were entitled to rely on . . . medical guidance and it moreover demonstrates that they did not act with deliberate indifference to the plaintiff's condition.") (citing cases).

    Given the current record, even construing all facts and reasonable inferences in the plaintiff's favor, it cannot be said that HCDOC's non-medical staff acted, under the

circumstances, with deliberate indifference to Ornelas's serious medical needs.  See Burrell, 307 F.3d at 8 (prison officials "cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided."). For those reasons, Robinson, Munyanya, Gardner, Gordon, Jordan, Slack, Medic, Antillus, Boyer, and Robbins are entitled to summary judgment on plaintiff's deliberate indifference claims.

3.  Municipal Liability

Plaintiff has asserted a municipal liability claim against Hillsborough County, HCDOC, HCDOC Superintendent David Dionne, in his official capacity, and Fuller, in his official capacity as Health Services Supervisor of the Valley Street Jail. [9] Defendants contend that plaintiff's deliberate indifference claims against Hillsborough County and the HCDOC should be dismissed, because plaintiff cannot establish the requisite

---

[9]     Defendants correctly argue that plaintiff's claims against David Dionne and William Fuller "in their official capacity" are equivalent to a suit against their employer, Hillsborough County, and HCDOC.  Therefore, defendants say, those claims are redundant and should be dismissed.  The court agrees.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("an official capacity suit is, in all respects other than name, to be treated as a suit against the entity"); see also id. at 167 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, for under Monell, local government units can be sued directly for damages and injunctive or declaratory relief.").

causation – that Ornelas's injury was caused by a policy,
practice and/or custom maintained by the County and the DOC.

It is well established that a municipal entity cannot be
held liable under 42 U.S.C. § 1983 on a theory of respondeat
superior or vicarious liability; the municipality itself must
proximately cause the constitutional injury, through the
promulgation (or tacit approval) of a municipal policy or
custom.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 385
(1989).  See generally Monell v. Dept. of Social Services of
City of New York, 436 U.S. 658 (1978).  A Section 1983 plaintiff
must demonstrate that the challenged municipal custom or policy
was the "moving force" behind the constitutional injuries at
issue."  Board of County Commissioners of Bryan County v. Brown,
20 U.S. 397, 404 (1997).  In other words, plaintiff must
establish "that the municipal action was taken with the
requisite degree of culpability and must demonstrate a direct
causal link between the municipal action and the deprivation of
federal rights."  Board of County Commissioners of Bryan County
v. Brown, 520 U.S. at 404 (emphasis in original).

Plaintiff first argues that HCDOC's policy of having
corrections officers "flag" an inmate during booking for
screening by medical staff is problematic, since corrections

35

officers are not qualified to make those determinations.  One
problem with that argument is that Ornelas was properly flagged
and evaluated by Martin during the booking process.  A mental
health screening was performed, and Martin subsequently
contacted Dr. Harris, the on-call psychologist for HCDOC.
Ornelas was then placed on "special watch."  Thus, plaintiffs
cannot establish that HCDOC's policy caused Ornelas's injury.
Plaintiff's contentions related to the HCDOC's policies
regarding inmates under IEA orders, and the restraint chair, are
similarly unpersuasive.  Such policies may have been implicated
in the way Ornelas was dealt with while at the jail, but
plaintiff points to no competent evidence tending to show that
those policies, as polices, operated as the "moving force"
behind the injuries.  The gravamen of plaintiff's complaint is
that corrections staff were deliberately indifferent to
Ornelas's medical needs.

   Plaintiff also argues that HCDOC's training of the
corrections officers and medical staff was inadequate.
Specifically, plaintiff points to training inconsistencies
relating to inmates with IEA orders, and inmates demonstrating
symptoms of mental illness.  While plaintiff rightly concedes
that a "pattern of similar constitutional violations by
untrained employees is 'ordinarily necessary' to demonstrate

deliberate indifference for purposes of failure to train," she argues that such evidence is not necessary here because the consequences of failure to provide such training are "patently obvious." Pl.'s Opp. to Mem. in Supp. of Summary Judgment at 23 (quoting Connick v Thompson, 563 U.S. 51, 62 (2011)).

In Connick v. Thompson, 563 U.S. at 62, the Supreme Court stated, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." Id. at 68. "Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." Id. (citations and internal modifications omitted). Instead, a plaintiff must "show that it was so predictable that failing to train . . . amounted to conscious disregard" for Ornelas's constitutional rights. Id. at 71 (emphases in original).

Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019), is instructive. In Gray, plaintiff argued that her constitutional

rights were violated by the town's deficient training of its
police officers "with respect to proper protocol for interacting
with persons suffering from mental illness."  While plaintiff
was unable to show a pattern of similar constitutional
violations, "[i]n an effort to close [that] gap," she offered
"expert testimony about appropriate police practices for
interacting with persons with disabilities," arguing that,
"coupled with the facts of the encounter," there were questions
of material fact as to whether the Town failed to properly train
its employees.  Id.

> Our court of appeals was unpersuaded:
>
> [T]hese assertions are insufficient to support a
> failure-to-train claim.  It is not enough to show that
> the Town's training regimen was faulty; [plaintiff]
> must also show that the Town knew or had reason to
> believe that such a regimen had unconstitutional
> effects.  [Plaintiff] has tendered no evidence of past
> violations sufficient to put the Town on notice of
> such effects.  Given this yawning gap in her proof,
> [plaintiff] has not made out a genuine issue of
> material fact as to whether the Town was deliberately
> indifferent to the risk of the alleged constitutional
> violation.

Id. at 14.  So too, here.  Plaintiff fails to provide a rational
basis upon which to distinguish the facts at issue here from
those in Gray.  What happened to Ornelas is not "so obviously'
the consequence of a systemic lack of training, as opposed to

the decisions of individual" HCDOC employees.  Hill v. Walsh,
884 F.3d 16, 24 (1st Cir. 2018).


    Accordingly, defendants are entitled to summary judgment on
plaintiff's municipal liability claim.


## Section 1983 — Excessive Force

    Plaintiff's Section 1983 excessive force claim is asserted
against Officers Robinson, Gardner, and Munyanya.  To establish
an excessive force claim, "a pretrial detainee must show . . .
that the force purposely or knowingly used against him was
objectively unreasonable."  Kingsley v. Hendrickson, 576 U.S.
389, 396-97 (2015).

> [C]onsiderations such as the following may bear on the
> reasonableness or unreasonableness of the force used:
> the relationship between the need for the use of force
> and the amount of force used; the extent of the
> plaintiff's injury; any effort made by the officer to
> temper or to limit the amount of force; the severity
> of the security problem at issue; the threat
> reasonably perceived by the officer; and whether the
> plaintiff was actively resisting.

Id. at 397.


    Defendants argue that plaintiff's excessive force claim
fails as a matter of law because the force used by HCDOC in
removing Ornelas from the cell and placing him in the restraint

chair was reasonable and appropriate, given the circumstances. Plaintiff disagrees, contending that the corrections officers' actions would shock the conscience of any reasonable observer.

Plaintiff asserts that Ornelas was kicked in the head while at the jail, presumably by corrections officers.  To be clear, if Ornelas was intentionally kicked in the head by one of the HCDOC corrections officers while defenseless at any point during his stay at Valley Street, that action would constitute "excessive force."  But, this record does not include any competent evidence that Ornelas was, in fact, kicked.

Plaintiff speculates that Ornelas must have been kicked in the head, but offers only unsubstantiated rumors, as well as Ornelas's testimony, which is shown by other evidence in the record to be unarguably incorrect.  Ornelas testified at deposition that he was kneed in the back of the head and kicked in the side of his face while at the jail.  See Def.'s Exh. 7, Ornelas Dep. at 50:15-21.  Ornelas said these events occurred outside his cell.  Id. at 77:8-17.  But, that testimony is effectively contradicted by the HCDOC surveillance cameras' video recordings, which do not show Ornelas being kicked or kneed in the head, as claimed.  See Defs.' Exhibit 8, Martineau Decl. at ¶¶ 4-6.  Plaintiff does not dispute the authenticity of

that video evidence.  See O'Brien v. Town of Bellingham, 943
F.3d 514, 531 (1st Cir. 2019) ("when the record contains video
evidence, the authenticity of which is not challenged, the court
should ordinarily view the facts 'in the light depicted by the
video evidence.'") (quoting Underwood v. Barrett, 924 F.3d 19,
20 (1st Cir. 2019) (per curiam)).


       Perhaps because the record is lacking competent evidence
that Ornelas was purposefully kicked in the head by corrections
officers, plaintiff instead focuses her excessive force claim
largely on: (1) the methods used to extract Ornelas from his
cell; and (2) use of the restraint chair.


       (1)   Extraction of Ornelas from his Cell
       Plaintiff of course concedes that HCDOC's intervention was
necessary to keep Ornelas safe once he began banging his head
into the metal cell door.  But, she says, given Ornelas's
existing injuries and mental health conditions, the amount of
force used by the defendants to extract Ornelas from his cell
was excessive.  Plaintiff relies on Gray v. Cummings, 917 F.3d
at 11, where our court of appeals instructed: "the level of
force that is constitutionally permissible in dealing with a
mentally ill person 'differs both in degree and in kind from the
use of force that would be justified against a person who has

41

committed a crime or who poses a threat to the community.'"
(quoting Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir.
2010)).


However, plaintiff fails to point to competent evidence in
the record suggesting that Ornelas's mental illness was not
taken into account when determining the amount of force
reasonably necessary to stop him from hurting himself.  Prior to
physically stopping his self-destructive behavior and removing
Ornelas from his cell, the COs first attempted multiple de-
escalation techniques.  Jordan made several efforts to calm
Ornelas down, and to persuade him to comply with instructions by
speaking with him calmly.  See, e.g, Def.'s Exh. 2, Jordan Decl.
at ¶¶ 5-12.  See also Pl.s' Exh. 1A, Jordon Decl. 27:9-12 ("I
guess we probably tried for a good 15, 20 minutes or so to try
to get him to calm down and he kind of just kept stepping up
what he was doing.").  When Jordan's efforts were unsuccessful,
he used pepper spray three times.  Ornelas remained belligerent
and aggressive.  See Pl.'s Exh. 1A, Munyanya Dep. 46:13-19 (Q:
"And then you saw Sergeant Jordan call for the door to be
partially opened and then he was sprayed [with OC]?" A: "Yes."
Q: "Did the spray have any effect on him, to your observation?"
A: "No.") see also Pl.'s Exh. 1A, Jordon Decl. 27:13-20 ("I had
sprayed him with  . . . pepper spray.  He basically wiped it off

with his smock, didn't really seem to have much effect on him. He didn't really seem to be bothered by it at all."); id., Gardner Dep. 35:4-14.

As for the extraction itself, given the circumstances – Ornelas's belligerence; his leap off the top bunk, naked and slippery, towards the COs; the small size of the cell and crowded conditions; the slippery, urine-soaked floor; and that Ornelas injured one of the COs during the extraction – it is unclear exactly what "additional precautions" plaintiff would have had the COs take.  The facts before the court suggest the type and amount of force used by Gardner, Munyanya, and Robinson to remove Ornelas from his cell was not more than necessary to secure and restrain Ornelas, stop him from hurting himself, and remove him from his cell.

Plaintiff contends that the correctional officers gave inconsistent testimony regarding the extraction, thus creating a genuine issue of fact.  But, plaintiff fails to identify those inconsistencies in her briefing, and it is not obvious from the record what testimony she views as inconsistent.  The testimony of Robinson, Gardner and Munyanya, their reports, and their statements to the New Hampshire State Police all appear to be materially consistent, and supported by the testimony,

statements, and reports of Sergeant Jordan, as well as other HCDOC employees present at the extrication.  To the extent the testimony is not identical, those minor variations are not only immaterial, they are understandable, given the somewhat chaotic conditions of the extraction.

(2)  Use of the Restraint Chair

Plaintiff also asserts that the use of the restraint chair amounted to excessive force under the circumstances.  Plaintiff relies on Miranda-Rivera v. Roledo-Davila, 813 F.3d 65 (1st Cir. 2016), where police officers continued to use force on a detainee, even after he was restrained and posed no physical threat to himself or the corrections officers.  Plaintiff says the HCDOC officers behaved similarly in this case by leaving Ornelas in the restraint chair for several hours, despite "ample evidence that [Ornelas], once extracted from cell did not pose a danger to himself or others."  Pl.'s Opp. to Mot. for Summary Judgment at 31.  Plaintiff contends that, given Ornelas's mental state and condition, the use of the restraint chair was itself excessive, and keeping him in the chair violated his constitutional rights.[10]

_____

[10]    The decision to use the restraint chair was made by Lieutenant Boyer, who is not named in plaintiff's excessive force claim.  See Def.'s Exh. 2, Jordan Decl. ¶ 18 ("At this point, Lieutenant Boyer directed that Mr. Ornelas be restrained

Given the circumstances, defendants' use of the restraint chair did not violate Ornelas's constitutional rights.  Prior to being restrained, the defendants reasonably perceived that Ornelas posed an obvious and serious danger to himself and others.  Ornelas was purposefully and repeatedly striking his cell door with his head; he was spreading water and urine on his cell floor, increasing the chances that he would slip and fall; he was uncooperative, and belligerent.[11]  Given such

---

and placed in the restraint chair for his and the staff's safety and protection.")  See also Pl.'s Exh. 1, Statement of Material Facts at ¶ 346.  She stated, "I was concerned about him hitting his head.  He already had a head injury, and I couldn't allow him to continue to hurt himself[,] so I gave Sergeant Jordan the okay to put him in the restraint chair."  Pl.'s Exh. 1A, Boyer Dep. at 62:10-12.

[11]    Jordan, Munyanya, Robinson, and Gardner all testified that they thought Ornelas would further injure himself.

Jordan: he started smashing the door, he started kicking the door, punching the door and started ramming the door with his head which is, obviously a concern for us because he clearly had some injuries prior to coming in. . . . Any time somebody's striking . . . a 400-pound door with their head, it's a concern and he already had some head injuries.  We had to get him out.  The floor was soaked . . . it had urine and water, toilet water all over the place.  He started kind of pacing back and forth around the cell which, again, you know it's pretty slick in there so that was a concern, too.

Pl.'s Exh. 1A, Jordan Dep. at 26:11-15 – 27:5.

Munyanya: he was throwing water all over the floor, very harmful to himself.  I think he was harming himself.  I think

circumstances, HCDOC's use of the restraint chair to protect Ornelas from harming himself further, or physically harming staff, was reasonable, and cannot be considered excessive force.

Of course, plaintiff is correct that Ornelas posed no immediate threat to anyone, including himself, while restrained in the chair. But, there is no evidence that the defendants used any physical force against Ornelas once he was restrained, beyond the restraint itself. Once strapped in the chair, Ornelas was immediately medically evaluated by Martin (who was also present at Ornelas's extraction from his cell). That medical evaluation required that the COs turn Ornelas's head, but there is no evidence that the amount of force they used to do so was unreasonable, given their knowledge of his current

---

he was hitting his head on the door or punching himself and jumping on top of the bunk.

Pl.'s Exh. 1A, Munyanya Dep. at 24:1-5.

Gardner: Sergeant Jordan advised me that [Ornelas] was banging his head on the door and that we were going to have to go in to restrain him to keep him safe."

Pl.'s Exh. 1A, Gardner Dep. at 53:18-21.

Q: [A]t that point in time, one of your major concerns was that this man could hurt himself, correct?

Robinson: that's right.

Pl.'s Exh. 1A, Robinson Dep. at 56:1-4.

condition, and certainly no evidence that turning Ornelas's head was done "maliciously and sadistically . . . to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (quotations omitted). Ornelas's condition while in the chair was regularly and frequently monitored, both by the COs, and their supervisors, as well as by HCDOC's medical staff, who regularly examined and evaluated him.

To the extent that plaintiff is arguing that the amount of time that Ornelas remained in the chair constituted "excessive force," HCDOC policy required that an inmate in the restraint chair remain compliant for an hour before being released from the chair. See Pl.'s Exh. 1A, Martineau Dep. at 154:5-155:16. As Kingsley, 135 S. Ct. at 2472, instructs, courts should account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" (quoting Bell v. Wolfish, 441 U.S. 520, 540, 547 (1979)).

Finally, while restrained in the chair, Ornelas continued to be verbally aggressive, and to threaten the officers.  He

stated that he intended to "fuck shit up when I get out," told
COs to "go fuck yourself," stated "fuck all you COs," and
repeatedly responded "no," when asked whether he would be
compliant.  See Def.'s Exh. 2, Jordon Decl., at Exh A.; see also
Pl.'s Exh. 1A, Munyanya Dep. at 69:8-18, 77:18-78:5; Pl.'s Exh.
1A, Slack Dep. at 76:3-12; Pl.'s Exh. 1A, Jordon Dep. at 56:17-
57:8; Pl.'s Exh. 1A, Robinson Dep. at 80:23-81:1.  From those
statements, it was not unreasonable for these defendants to
conclude that Ornelas would continue to pose a danger to himself
or to others if released, until it was determined that his
medical condition had deteriorated and he required medical
attention by staff, and no longer posed a threat of injury.
Ornelas's restraint in the chair, itself, did not amount to
excessive force under the circumstances disclosed by the record.


     The extended period of restraint may have been unjustified
for another reason, i.e., because he should have been promptly
returned to the hospital, but not for the reasons argued by
plaintiff.  Accordingly, for the above reasons, defendants are
entitled to summary judgment on plaintiff's Section 1983
excessive force claim.

## CONCLUSION

     The existence of genuinely disputed material facts
precludes the entry of summary judgment in favor of the

Hillsborough County defendants on plaintiff's Section 1983 claims for deliberate indifference to Ornelas's serious medical needs, with respect to defendants Martin, Barnes, and Fuller. Accordingly, defendants' motion for partial summary judgment on those claims brought against Martin, Barnes, and Fuller, and, for now, against Superintendent Dionne (document no. 131), is **DENIED**.  The Hillsborough County defendants' motion for partial summary judgment (document no. 131) is otherwise **GRANTED**, as set forth herein.

The Elliot Hospital's motion for partial summary judgment on plaintiff's claim brought under the provisions of N.H. Rev. Stat. Ann. Ch. 135-C (document no. 134) is **DENIED** as moot.  The Elliot Hospital's motion for judgment on the pleadings as to plaintiff's claims for enhanced compensatory and punitive damages (document no. 133) is **GRANTED**, without objection by plaintiff.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 15, 2020

cc:  Counsel of Record

49